### ROGERS ET AL. *v.* ROGERS ET AL.

[No. 10,470. Filed April 18, 1919. Rehearing denied June 25, 1919.]

1. MASTER AND SERVANT.—*Workmen's Compensation Act.—Death Arising Out of Employment.*—Where a servant was killed by the accidental overturning of an automobile while conveying workmen from one camp to another at the direction of a member of the firm employing him, a duty which was frequently performed by him, the death arose out of the employment. p. 665.

2. MASTER AND SERVANT.—*Rights of Master.—Duties of Servant.*—It is the exclusive province of the master to determine the advisability of directing an employe to perform a certain duty and whether the performance of that duty would inure to the benefit of the business. p. 667.

# 660 APPELLATE COURT OF INDIANA,

3. MASTER AND SERVANT.—*Duty of Employe.—Obedience to Orders.* —It is the duty of an employe to obey all reasonable orders and instructions of his employer. p. 668.

4. MASTER AND SERVANT.—*Dismissal of Employe.—Disobedience.*— Generally, an employe's disobedience to the master's orders justifies a rescission of the contract of service and a peremptory- dismissal. p. 668.

5. MASTER AND SERVANT.—*Workmen's Compensation Act.—Performance of Duty at Master's Order.—Estoppel.*—Where an employe of a firm of contractors was killed by the overturning of an automobile while conveying a workman to a certain camp, at the direction of a member of the firm, such service being of the kind deceased was accustomed to perform, the employer will be estopped from claiming that the -employe was acting for the private benefit of an individual member of the firm. p. 668.

6. MASTER AND SERVANT.—*Creation of Relationship.—Contract.— Conduct.*—The relation of employer and employe is contractual and is a product of the meeting of the minds, and to create such relation there must be an express contract or such acts as will unequivocally show that the parties recognize one another as master and servant. p. 668.

7. MASTER AND SERVANT.—*Contract of Employment.—Requisites.— Definiteness as to Parties.*—It is essential that a contract of employment be definite and certain as to parties. p. 669.

8. MASTER AND SERVANT.—*Workmen's Compensation Act.—Contract of Employment.—Compensation.*—In view of §4 of the Workmen's Compensation Act (Acts 1915 p. 392, §80201 *et seq.* Burns' Supp. 1918), the obligation of the employer to pay, and the right of the employe to receive, compensation in accordance with the provisions of such act, becomes a part of every contract of service between every employer and employe covered by the act. p. 669.

9. MASTER AND SERVANT.—*Workmen's Compensation Act.—Appeal. —Review.—Evidence.*—In a proceeding for compensation for the death of a workman killed by the overturning of an automobile which he was driving at the direction of a member of a firm which employed him, wherein it was contended that at the time of his death decedent was performing a service for such firm member and not for the firm, evidence *held* to show that deceased was in his regular and usual employment for the firm at the time of the accident. p. 670.

10. MASTER AND SERVANT.—*Workmen's Compensation Act.—Employment of Son by Father.—Proceedings for Compensation.—Presumption.*—The fact that deceased was an adult son of a member of the employing firm creates no presumption affecting proceed-

ings against the firm for compensation under the Workmen's Compensation Act (Acts 1915 p. 392, §80201 *et seq.* Burns' Supp..1918), for the son's death. p. 670.

From the Industrial Board of Indiana.

Proceedings for compensation under the Workmen's Compensation Act by Edna Rogers and others against John S. Rogers and another. From a denial of an award, the applicants appeal. *Reversed.*

*Rufus W. East* and *Lee & Lee,* for appellants.

*Miller & Blair, Fesler, Elam, Young & Carter* and *L. S. Babcock,* for appellees.

DAUSMAN, C. J.—On June 5, 1917, one Horace M. Rogers was driving an automobile on a public highway. The automobile was accidentally overturned, the machine and driver both falling into a ditch. While held down by the automobile he died by suffocation or drowning. The appellants, his widow and five children, applied to the Industrial Board for an award of compensation on the ground that his death arose out of his employment with the firm of Rogers and Brown. A hearing before one member of the board resulted in an award at the rate of $10.45 per week. The appellees procured a review by the full board. On June 22, 1918, the full board reviewed the evidence and heard the argument of counsel, and thereupon took the matter under advisement.

On July 15, 1918, the board made the following entry of record: "That it is unable to determine with certainty whether Horace Rogers, at the time he received the injuries resulting in his death, was working for John S. Rogers and Luther Brown as a partnership, or was working for John S. Rogers individually. To the end that this point may be made

definite and certain by evidence, said cause is continued for further hearing upon review and the parties are hereby given permission to introduce additional evidence.''

On September 16, 1918, additional evidence was introduced, and the matter was again taken under advisement.

On November 1, 1918, the Industrial Board, by a majority of its members, denied an award and ordered that the appellants take nothing by their complaint, and that they pay the costs of the proceeding. The minority member of the board was of the opinion that on the facts the appellants are entitled to an award.

There is no controversy whatsoever concerning the following evidential facts: ''John S. Rogers and Luther Brown were partners, engaged in the business of constructing and repairing highways in the firm name of Rogers & Brown. The firm had contracts for the construction of at least two roads in Monroe county. One of these roads is known as the Dolan road, and the other is known as the Harrodsburg road. As a matter of convenience and expediency, the members of the firm divided their work. Rogers had charge of the work on the Dolan road, and Brown had charge of the work on the Harrodsburg road. Each member of the firm owned, as his individual property, a Ford roadster. The firm owned, as firm property, a motor truck and some teams. Each member of the firm also owned some teams individually. Three teams were in use on the Dolan road. Brown had about twenty men working under him on the Harrodsburg road. Whenever on account of rain it became too wet to work down at the

Harrodsburg job, Brown and his entire crew would come up to the Dolan road where they would work until conditions would permit them to resume at the former place. Sometimes John S. Rogers and the men under him would go down to the Harrodsburg road and work there.

"Horace Rogers was a son of John S. Rogers, and was about 29 years of age. He had a wife and five children with whom he lived as head of the family. He had been employed by Rogers & Brown ever since the firm was organized in 1915. He acted as a sort of general helper. He would run the drill, boss the quarry, direct the workmen, and do whatever the firm had for him to do. He had no regular hours for beginning or quitting work. Sometimes he would get up at three o'clock in the morning and load the holes and shoot them. He sometimes hauled coal on the truck. Sometimes he would start at nine o'clock or later in the evening to take supplies on the motor truck from Bloomington to the camps. The Dolan camp was about six miles north, and the Harrodsburg camp was about fifteen miles south, from Bloomington. He would use either automobile, or the truck, as convenience required, in the business of the firm. He would convey men and supplies back and forth between town and camps; and that was part of his work. During the progress of the work on the Harrodsburg road he spent practically all of his time there with Mr. Brown. He had more experience in road building than Mr. Brown, and the latter relied on him for advice. The firm paid him $15.00 per week and board at the camp. The board was worth $4.00 per week. His wages had been paid him uniformly by the firm of Rogers & Brown.

"On the night of April 4, 1918, it rained so that it became too wet to work. The next morning Horace went to Bloomington to register for military service, and Mr. Brown went with him. They arrived at Bloomington about eleven o'clock a. m. At noon Horace went to his own home for dinner. After he had registered, he and Brown bid on a road contract which the county commissioners were letting on that day. The bids were opened at 2 p. m. and their bid was rejected. About 4 p. m. he showed Brown his registration card and said jokingly that he would not need that road contract, for he would have to go to war. Then Brown and Horace went to a garage. At the garage Horace said to Brown: 'I will go and take the men out there. How long will you be gone?' Brown answered: 'Not very long.' Horace replied: 'Well, if I am not back when you get back, you wait here and I will meet you and we will go back to the work at Harrodsburg.' Then Horace took his father's car and started to the camp at Dolan, to take the men out there. Brown waited for him until supper time. Then, supposing that Horace had gone to his own home to get supper, as he sometimes did, Brown stepped into a picture show. Soon after entering the picture shown, Brown was informed of the accident.

"Two other workmen went from the Dolan camp to Bloomington that morning to register for military service. One of them, Andy Walke, worked on the Dolan job part of the time, and part of the time on the Harrodsburg job. At this particular time he was up north of town on the Dolan job. In addition to his work on the road he was also stable boss at the Dolan camp. It was his duty to see that all the horses there had proper care. John S. Rogers was in Blooming-

ton that morning, but left at 10:10 a. m. for Osgood. Before departing he left instructions for his son Horace to take his Ford roadster and convey the two workmen from Bloomington to the Dolan camp. He was anxious about the matter and wanted to be sure that Walke would be at the camp that evening to care for the horses. In obedience to this order, Horace took the two men to the Dolan camp, intending to return to Bloomington and from there to go to the Harrodsburg camp. On his way back, the road being wet and slippery, the machine skidded and turned over, resulting in his death. The firm of Rogers & Brown carried insurance for the benefit of their employes in accordance with the Workmen's Compensation Act.''

From the facts as above stated there is but one legitimate conclusion to be drawn, viz., that the death of Horace Rogers arose out of his employment with the firm of Rogers and Brown. It will be observed that for a considerable time he had been employed by the firm of Rogers and Brown, and that his wages had been paid uniformly by the firm of Rogers and Brown. When the nature of the work which he had been doing from day to day for that firm is taken into consideration, the presumption naturally arises that, while conveying the workmen to the camp and returning therefrom, in obedience to the order given by a member of that firm, he was performing a service which pertained to the firm's business. Each member of the firm stated repeatedly in his testimony that Horace Rogers was in the employment of the firm at the time of his death. As between the firm and the dependents of the deceased we perceive no reason why an agreement for compensation should

not have been made in accordance with §57 of the Workmen's Compensation Act.    Acts 1915 p. 392, §8020o2 Burns' Supp. 1918.

But Horace Rogers was a son of John S. Rogers, and a strong friendship existed between Horace and Luther Brown.  Apparently these circumstances generated a suspicion of collusion as against the insurance carrier.  The insurance carrier was made a defendant in the proceeding before the Industrial Board, and is named as an appellee in this court. From all the circumstances of the case, we must assume that the attorneys appearing of record for the appellees really represent only the insurance carrier. Accordingly the hearing was devoted to the single purpose of testing the truthfulness of the admissions made by the members of the firm.  The hearing was continued for the express purpose of procuring evidence which would definitely settle the question whether the deceased was an employe of the firm or an employe of John S. Rogers at the time the fatal accident occurred.  After two months the hearing was resumed, but the evidence then presented was not of a character to furnish much additional light on that question.

In addition to the facts above stated, the evidence discloses without conflict that John S. Rogers had an arrangement with his partner whereby he received pay for the use of the teams owned by him when used in the partnership business.  His compensation for his teams was computed by the hour for the time they actually worked for the firm.  He paid from his individual funds for the feed consumed by all the horses at the Dolan camp, and also paid from his individual funds various other items of expenses occasioned by

the work there. Brown managed the business at the Harrodsburg camp on the same plan. From time to time the two partners would "get together" and adjust their accounts. By these periodical adjustments each partner would "get back" his individual money so expended.

The evidence is confusing and uncertain as to how Mr. Walke was paid in the first instance. John S. Rogers paid him, but whether he paid him from his individual funds or by the firm's checks is not clear. The evidence as to the ownership of the teams at the Dolan camp is also conflicting; and whether all of them belonged to Rogers, or part of them to Rogers and part to the firm, is not clear.

The method of conducting the firm's business evoked a series of questions. In whose employment was Mr. Walke? If John S. Rogers paid Mr. Walke from his individual fund, would not that fact make Mr. Walke the employe of John S. Rogers as an individual? If Mr. Walke was the employe of John S. Rogers as an individual, does it not follow logically that Horace Rogers was in the employment of John S. Rogers when taking an employe of John S. Rogers to the partnership camp on the Dolan road and while returning therefrom?

It is unnecessary to determine whether Mr. Walke was an employe of the firm or an employe of John S. Rogers. If Mr. Walke were asking compensation for an alleged injury arising out of his 2. employment with the firm of Rogers and Brown, and if his right to compensation was being contested on the ground that he was not an employe of the firm, then his status as an employe necessarily would have to be determined; but in the case at bar,

it is wholly irrelevant. When a member of the firm directed Horace Rogers to take Mr. Walke to the Dolan camp, it was his duty to obey. There was no obligation resting on him to inquire whether the performance of that duty would inure to the benefit of the firm. That question was no concern of his. It would be an unjust and unreasonable rule that would have required him to decide that question at his peril. The presumption is that the master knows his own business; and it is the exclusive province of the master to determine questions of that character for himself.

It is the duty of an employe to yield obedience to all reasonable orders and instructions of his employer. This rule is fundamental. Disobedi-

3-5. ence, as a general rule, justifies a rescission of the contract of service and the peremptory dismissal of the employe. 18 R. C. L. 520. As between Horace Rogers and the firm, it is immaterial whether Mr. Walke was an employe of Rogers and Brown, or of John S. Rogers, or whether he was anybody's employe. The direction given to Horace to convey the workman to the Dolan camp was reasonable; it called for a service of the kind he was accustomed to render for the firm; and it was his plain duty to perform it. As between him and the firm, the latter cannot be heard to say that the performance of that duty was for the private benefit of an individual member thereof.

The relation of employer and employe is contractual. Like every other contractual relation, it is the product of a meeting of the minds. West-

6. ern Union Tel. Co. v. Northcutt (1909), 158 Ala. 539, 48 South. 553, 132 Am. St. 38; 18 R. C. L.

490. To create the relation of employer and
7. employe there must be an express contract, or
such acts as will show unequivocally that the
parties recognize one another as master and
8. servant. 18 R. C. L. 493. It is essential to the
existence of every contract of employment that
it be definite and certain as to parties. *Parsons* v.
*Trask* (1856), 7 Gray (Mass.) 473, 66 Am. Dec. 502.
By virtue of §4 of the Workmen's Compensation Act,
*supra,* the obligation of the employer to pay, and the
right of the employe to receive, compensation in ac-
cordance with the provisions of said act becomes a
part of every contract of service between every em-
ployer and employe covered by said act, *supra. Carl
Hagenbeck, etc., Shows Co.* v. *Leppert* (1917), 66 Ind.
App. 261, 117 N. E. 531. To the employe this right
to compensation is a precious element of the contract.
One of the considerations, and an important one,
which he gives for that right, is the relinquishment
by himself and his dependents of all other rights and
remedies at common law or otherwise for his injury
or death arising out of the employment. §6 W. C. A.,
*supra.* A contract of this character will not be lightly
overturned.

The relation of employer and employe, having been
created by the voluntary act of the parties, usually
must be terminated by the parties. It may be termi-
nated, of course, by the death, illness, or insanity of
either party, by the expiration of the term fixed in
the contract, or by mutual consent. The employer
may dismiss his employe at any time for cause, or
arbitrarily and without cause. The employe may quit
the service of his employer at any time for cause, or
arbitrarily and without cause. Of course, in some

instances there may be liability for damages resulting from breach of contract; but that feature is not here involved.

In the case at bar there is nothing in the evidence tending to indicate an intention on the part of any person concerned to terminate the relation of employer and employe which had long existed between Horace Rogers and the firm of Rogers and Brown, or to indicate a mutual understanding that the particular service rendered by him should be regarded as outside the regular employment. Therefore, we must and do hold that from the time he started the automobile on the trip to the Dolan camp to the time of his death he was in the regular and usual employment of the firm of Rogers and Brown.

Horace Rogers was not a member of his father's family. He had been long emancipated and was living with his wife and children. No presumption arises out of the mere relation of father and son which can have any influence on the case at bar. There is no evidence to show that the relation of father and son has any bearing whatever on the controversy.

The action of the Industrial Board is reversed, and said board is directed to make an award of compensation.

Batman, P. J., did not participate.